GEORGE A. MANNING, Appellee, v. W. G. SPEES, Appellant.

No. 41672.

FEBRUARY 7, 1933.

REHEARING DENIED JUNE 23, 1933.

Roberts & Roberts, for appellant.

Starr & Jordan, for appellee.

Evans, J.—From January 1, 1930, to July 26, 1931, the plaintiff served as a hired man for the defendant upon the defendant's farm. The parties had sustained the same relation to each other for three years from 1924 to 1927, inclusive. The plaintiff was the uncle of the defendant. The occasion for the last hiring of the plaintiff was the illness of the defendant. He was suffering from a stomach ailment, and spent most of his time in a hospital for the first five months of the year 1930. During that period he was home occasionally for short intervals. The following paragraph of the defendant's counterclaim is a sufficient indication of its nature.

"Defendant says that during his absence and while he was badly afflicted and in the hospital and at a time when it was generally believed that this defendant might not live very long, the plaintiff knowing said fact, in breach of the confidence that this defendant had reposed in the plaintiff, and in violation of the rights of both this defendant and his wife, deliberately sought to take advantage of his wife under said circumstances, and openly and expressly proposed to her that they begin to get ready and plan matters for the time when this defendant would die, and that she should promise the plaintiff to marry him upon this defendant's death. That upon his wife's rejecting the plaintiff's said proposal and positive refusal to listen to his approaches along said line, the plaintiff became offensive and abusive to her and thereafter, on different occasions, in the absence of this defendant, not only used abusive language to

this defendant's wife, but on two separate occasions assaulted and struck her, and on one occasion knocked her down.

"That said abusive conduct toward defendant's wife on the part of the plaintiff caused the defendant's wife to become very nervous and largely unfit to perform her regular services for defendant's family, and when said wrongful conduct on the part of the plaintiff toward defendant's wife became known to this defendant, he being at the time in very bad health and naturally very nervous, it very greatly affected his nerves and his health."

Damages are claimed to the amount of $5,000. In support of the counterclaim the wife of the defendant testified as follows:

"Mr. Manning made improper statements to me on or around the 20th of January, 1931, about five o'clock in the morning. We were in the kitchen in my home at the time. Gladys Tuller was present. * * *

"My husband was in the hospital and he was quite bad and I was worried almost to death for my children and my family and Uncle George had been wonderful to us. He had been ideal and I thought the world of him. He is my husband's uncle. He said to me that one on the farm had to look ahead for the crops and all and I said I realized it and then he asked me if I didn't think my husband was going to die and I said I did. Then he said, 'Well, Lulu, if you will promise to marry me, through no disrespect to Will,' he told me that he would go ahead with the farm work and look after the children and take care of us and if Will got well, this was all right but if he didn't I was to make this promise. Then he asked me to marry him. I said to be still, I wouldn't listen to him. He kept on telling me and I said to be still, I would not listen to it. He said, 'do you mean this,' or something to that effect, and I said, 'I absolutely do,' and he raised up off of his chair, threw down his arm and said, 'I'll bring you to it.' * * *

"My husband was in the hospital at Muscatine, Iowa, during all this time. I had done nothing that I knew of to cause Mr. Manning to treat me that way except to refuse to become his wife.

"Mr. Spees was in the hospital altogether twenty-two weeks and a half. At the time these transactions took place he had been there about two or three weeks. The condition of his health was serious. I did not communicate these transactions to him at that time.

"I asked the physician and he told me not to on account of

his health. I told him I wanted to talk to my husband about some things pertaining to the hired man and he said that I must not talk to him and tell him anything that would worry him. That is absolutely the reason why I didn't."

This witness also testified that the defendant threatened her with violence at that time, and that on another occasion a few days later he struck her on the back, causing her to fall to the ground. The conversation of January 20 was had in the presence of Gladys Tuller, a young woman in her teens, and a member of the defendant's family. She testified to the same effect quite literally as did the wife.

The defendant himself testified as follows:

"I first heard of the statement my wife makes in regard to Mr. Manning's proposition of marriage and his assault and battery on her about the middle of June, 1931.

"Q. When you first heard of that, how did it affect you? Your nerves and your health? A. It was a shock to me, affected me all over, affected my stomach where my trouble was anyway. The shock made me nervous, couldn't eat or sleep either one.

"Q. How long did you notice such effect as you have just stated to the jury to continue? About how long would you say that you noticed the effect in your health immediately following the news of this conduct? A. Oh, I suppose the worst part of it was a month or two when I commenced getting away from it."

The foregoing indicates on its face the theory of recovery advanced by the defendant. This is elaborated in the briefs. The defendant disclaims any right of recovery for alleged injury inflicted upon his wife either physically or mentally. Nor does he claim that there was any alienation of the affections of the wife.

What he does claim is that, at the time his wife disclosed to him the conduct of the plaintiff in June, 1931, he was in an enfeebled condition bodily, and that the disclosure was a shock to him and intensified his stomach ailment for the period of a month or two.

It will be noted that the ruling of the trial court involves the consideration of two important questions:

First, what was the proximate cause of the pain and suffering for which the defendant sues? This did not ensue at the time of the

alleged wrongful conduct of the plaintiff. It did ensue five months thereafter. The defendant's contention in argument is that the cause of action accrued to the defendant, not in January, when the conduct was perpetrated, but in June, when the conduct was recited to the husband by the wife.

Secondly, will a cause of action lie for the mere mental suffering, which was unattended with any bodily or physical injury? The appellant discusses only the former of these questions, and we shall need to go no farther than that in this discussion.

The subject of proximate cause is one that lends itself to limitless discussion. The lines of distinction are often very fine. Upon this record, however, we see no special complication. So far as our own cases are concerned, the principal reliance of the appellant appears to be that of Watson v. Dilts, 116 Iowa 249, 89 N. W. 1068, 57 L. R. A. 559, 93 Am. St. Rep. 239. We do not think that the cited case supports the position of the appellant. That was a case where a wrongdoer entered the home of the plaintiff in the nighttime, which entry resulted in an encounter between him and the plaintiff's husband in her presence. She herself was involved in the same peril as that of her husband. Her fright was so great as to cause immediate nervous prostration, which later confined her to her bed for many weeks. There could be no doubt under the facts in that case as to the proximate cause of her nervous prostration. No intervening act suspended the operation of the defendant's wrongful entry. More-over, the resulting physical injury was immediate and complete. In that case we recognized the general rule that physical disability produced by fright unaccompanied by physical impact does not ordinarily give rise to a cause of action. But we held that the facts in the cited case were beyond the ordinary, and in effect that the intruder had physically invaded the home and the privacy of the plaintiff, and had conducted himself in such a manner to the peril of its occupants as to present the full equivalent of a physical attack. We differentiated the case from Mahoney v. Dankwart, 108 Iowa 321, 79 N. W.134, and Lee v. City of Burlington, 113 Iowa 356, 85 N. W. 618, 86 Am. St. Rep. 379. The Mahoney case tends to support the trial court in its ruling in the case at bar. In Kramer v. Ricksmeier, 159 Iowa 48, 139 N. W. 1091, 45 L. R. A. (N. S.) 928, we said:

"Regardless of particular theory, the courts usually look with some disfavor on this kind of an action because of the great un-

certainty presented both as to cause and effect. Some courts, including our own, have gone further than others in sustaining a right of action for physical injuries resulting from fright alone when caused by the unlawful conduct of the defendant. These cases have usually involved acts of the defendants therein committed in the immediate presence of the plaintiff."

In Zabron v. Cunard Steamship Company, 151 Iowa 345, 131 N. W. 18, 34 L. R. A. (N. S.) 751, we held that the mental suffering of disappointment, which resulted from the negligence of the defendant, could not furnish the basis for a claim of damages.

In Holdorf v. Holdorf, 185 Iowa 838, 169 N. W. 737, it was made to appear that the defendant assaulted the plaintiff with a dangerous weapon, and put her in immediate and imminent peril for her bodily safety. Because of the evident intention of the defendant to carry the assault to the point of battery, we held such conduct to be the proximate cause of the physical injury resulting from fright only.

None of these distinguishing features which are apparent in the foregoing cases are present in the case at bar. The alleged wrongful conduct of the defendant occurred in the absence of the plaintiff. He was at no time in any bodily peril. He was involved in no fright. The event complained of was long past before he discovered it. The immediate cause of his emotion was the later recital of the fact by his wife to him. The cause of his indignation, it is true, was the alleged wrongful conduct of the defendant. But he was not entitled to measure his indignation in terms of damages. We think the trial court properly ruled the point.

The judgment below is accordingly affirmed.

KINDIG, C. J., and ALBERT, DONEGAN, UTTERBACK, STEVENS, and KINTZINGER, JJ., concur.